**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4005-17

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

RICK KING,

    Defendant-Appellant.

_____

Submitted March 16, 2022 – Decided June 24, 2022

Before Judges Sumners, Vernoia and Firko.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment Nos. 14-01-0084 and 17-01-0181.

Joseph E. Krakora, Public Defender, attorney for appellant (John A. Albright, Designated Counsel, on the brief).

Theodore N. Stephens II, Acting Essex County Prosecutor, attorney for respondent (Frank J. Ducoat, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Rick King appeals from his conviction and sentence on charges arising from two separate incidents—a 2013 robbery of Roseway Liquors in Irvington and the 2015 murder in Roseway Liquors of the sole witness to the robbery, Amit Patel (Patel). Defendant claims the court erred by: joining for trial the separate indictments on the charges related to each incident; allowing improper lay opinion testimony during the narration of surveillance recordings; admitting crime scene and other photographs; admitting testimony concerning Patel's identification of defendant as the perpetrator of the robbery; failing to sua sponte instruct the jury on issues concerning identification and the playback of recordings during deliberations; admitting testimony from the State's fingerprint expert; and imposing an excessive sentence. Based on our review of the record in light of the parties' arguments and applicable legal principles, we reverse and remand for a new trial.

I.

On October 31, 2013, Patel worked at Roseway Liquors, a store his family owned and operated at 701 Lyons Avenue in Irvington. He reported to the police that an individual had entered the store, robbed him at gunpoint, and fled from the store with stolen cash. The police stopped defendant a short time later.

2

Defendant fled on foot, and he was apprehended and arrested by the police after a short chase. In 2014, a grand jury charged defendant in an indictment with first-degree robbery, possessory weapons offenses, aggravated assault, resisting arrest, and obstruction.

On February 15, 2015, fifteen months after the robbery and while defendant awaited trial on the charges in the indictment, Patel was again working at Roseway Liquors when an individual entered the store, directed Patel lay down on the floor, and shot Patel once at close range through the head. Defendant was later arrested for Patel's murder and charged in a 2017 indictment with murder, possessory weapons offenses, and tampering with a witness.

The State moved to join the 2014 and 2017 indictments for trial. Defendant opposed the motion. The court granted the motion and subsequently conducted a lengthy jury trial. We summarize the evidence presented at trial to provide context for our discussion of the arguments presented on appeal.

The 2013 Robbery

On October 31, 2013, Patel called 9-1-1 and reported he was in Roseway Liquors and was just robbed at gunpoint by an individual who took cash and fled towards a nearby park.[1] Irvington police officers Jamar Neal and Steve Gene

---

[1] At trial, the jury heard Patel's 911 call.

Simon responded to the store and spoke with Patel. Neal testified Patel said he was robbed by a black male, who was approximately 5'10" tall, weighed 170 pounds, wore a black hooded sweatshirt that displayed a skull design, possessed a chrome revolver, and took cash in denominations of fifties and tens. Patel said he saw the suspect quickly walk away from Roseway Liquors, and he described the route the suspect traveled before he lost sight of the suspect in a nearby park. Neal contacted the police dispatcher and relayed the description and direction of the suspect's flight.

Irvington Police Detective Brechner Jeannot and Officer Shenara Cannon were on patrol, overheard the information provided to the dispatcher, saw a man matching the suspect's description—wearing blue jeans, black boots, and a black hooded sweatshirt—walk down a sidewalk, run into an alley, and then emerge from the alley wearing only blue jeans, black boots, and a black tank-top. They noted the weather was cold and rainy and the man was sweating, nervous, jittery, and out of breath. Cannon took the man, later identified as defendant, into custody, while Jeannot reported the events to dispatch.

Additional officers arrived and overheard a report to dispatch from Neal, describing what was taken from Roseway Liquors. In response, defendant shoved Cannon and fled, ignoring instructions from the officers to stop.

A-4005-17

Officers pursued defendant on foot, and others pursued defendant in police cars. Defendant was apprehended when he collided with a police car as he ran onto a nearby street. Defendant alleged he was intentionally struck by the police car, but Irvington Police Detective Michael Gardner, who investigated the incident as a member of the department's Internal Affairs Unit, testified at trial he believed defendant ran into the police car while fleeing. During his testimony, Gardner also narrated a surveillance video recording from a Woroco gas station showing an individual collide with a police car, and identified defendant as the individual depicted in the recording. In any event, defendant was apprehended following the collision at the intersection at which the gas station was located.

Neal then transported Patel to the gas station for a showup identification. Neal testified Patel said defendant's height, weight, jeans, and boots matched those of the individual who robbed the store, and he explained Patel also identified the currency in defendant's possession as matching the cash taken during the robbery—one fifty-dollar bill, thirteen ten-dollar bills, and five one-dollar bills. Neal also testified Patel was unable to identify defendant as the perpetrator of the robbery because the perpetrator's face had been covered by a black-and-white bandana during the robbery.

A-4005-17

Hours after the robbery, Patel provided a video-recorded statement to the police. During the statement, Patel repeated the information he previously provided to the police concerning the robbery and the perpetrator, including the description of the perpetrator, his clothing, and the gun. Patel also again said he could not identify defendant as the perpetrator because the perpetrator's face was covered during the robbery. The recording of Patel's statement was played for the jury at trial.

The officers searched the alleyway Jeannot and Cannon had observed defendant enter wearing a black hooded sweatshirt, and emerge from wearing blue jeans, black boots, and a black tank top. In a garbage can in the alleyway, police recovered a black hooded sweatshirt with a skull design on it, a hat, a black thermal long-sleeve shirt, gloves, a black-and-white bandana, and a loaded silver .38 caliber revolver. Inside the hooded sweatshirt's pocket was a cell phone.

At trial, the State presented a fingerprint expert who testified three fingerprints found on the gun could not be confirmed as belonging to defendant but could not be ruled out as belonging to defendant. Testing revealed DNA recovered from the gloves and hooded sweatshirt belonged to defendant, and the

cell phone included naked photographs of defendant that he had apparently taken of himself.

Following defendant's arrest, he was transported to the hospital, where Gardner read defendant his Miranda[2] rights and interrogated defendant concerning his claim he was injured after being struck by the police car. During the interrogation, defendant said he lived at 64 Union Avenue in Irvington and claimed he could not recall his telephone number. Defendant also said he had been at a friend's house prior to being stopped by the police and he fled because he had an active warrant for his arrest. The audio recording of defendant's statement was played for the jury.

Detective Christopher Burrell later conducted a second interrogation of defendant after again advising defendant of his Miranda rights. During the interrogation, defendant denied that the items recovered from the alleyway were his, admitted he may have been in the area to smoke marijuana in the park, and claimed the money found in his possession was a work-related payment. The video recording of the statement was played for the jury.

After advising defendant of his Miranda rights, Burrell questioned defendant a second time. Defendant claimed he had been in the park smoking

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

A-4005-17

marijuana with Jerrell Alexander, who defendant described as a gang member who was known as "Black." Defendant said he touched a silver revolver Alexander had shown him, and that Alexander was wearing blue jeans and a black hooded sweatshirt on the day of the robbery. A video recording of Burrell's interrogation of defendant was played for the jury. The police investigated Alexander as a possible perpetrator of the robbery but did not discover any evidence connecting him to it.

As noted, in 2014, a grand jury charged defendant in an indictment with charges related to the robbery and defendant's flight from the police. On January 29, 2015, the State received the results from DNA testing of the gloves and black hooded sweatshirt recovered from the garbage can in the alleyway. The results revealed defendant's DNA on the gloves and the sweatshirt's cuffs and collar. Two weeks later, Patel was murdered in Roseway Liquors.

The February 15, 2015 Murder

At around 3:30 p.m. on February 15, 2015, Patel was working at Roseway Liquors with his father, Girish Patel (Girish).[3] Girish went into the back of the store, while Patel remained in the front. A short time later, Girish heard a

---

[3] Because Amit Patel and his father Girish Patel share the same surname, for the purpose of clarity we refer to Amit Patel as Patel, and we refer to his father as Girish. We intend no disrespect by doing so.

gunshot, ran to the front of the store, and saw Patel lying on the floor. Girish ran to the door, looked outside, and saw a person running away. As a customer approached the store, Girish instructed him to call 9-1-1. Video recordings from within the store depicted the perpetrator's entry into the store, Patel's murder, the perpetrator's exit, and the movements of Girish and others following the murder. The video recordings and the audio recording of the 911 call were played for the jury at trial.

Paul Bell, a frequent customer at Roseway Liquors, arrived and entered the store. He observed Patel laying in a pool of blood on the floor and heard Girish screaming. Bell asked Girish if the store was robbed, but after checking the cash register, Girish determined nothing had been taken.

Irvington Police Detective Mario Clarke and Officer Miles Brown responded to Roseway Liquors and searched for suspects. Later, Essex County Prosecutor's Office Detective John Manago arrived at the store. Manago thereafter served as the lead detective investigating the murder.

Manago recovered a 9 mm shell casing on the floor of the store, and he observed that nothing had been stolen. He also observed that Patel had a ring on his finger, and $1,000 in cash, keys to a BMW automobile, and a cell phone in his pockets.

A-4005-17

During his investigation, Manago interviewed Nelson Escobar, the building superintendent at 64 Union Avenue, an Irvington apartment building located blocks from Roseway Liquors, and the place defendant said he lived during his interrogation by Gardner following the 2013 robbery.

Escobar reviewed recordings from the building's surveillance cameras that were made the day of the murder. At trial, Escobar testified he saw the individual shown in the recordings on multiple occasions during the six years prior to the murder and had most recently seen the individual a week before Patel's murder. After viewing a photograph array at the police station, Escobar identified defendant as the individual shown in the recordings and Escobar identified defendant at trial as the individual shown in the 64 Union Avenue surveillance recordings. Escobar testified defendant had family members living in the apartment building who defendant often visited, and he had seen defendant sleeping in the building's laundry room over the years.

During the investigation of Patel's murder, police obtained surveillance recordings from cameras located at various businesses between Roseway Liquors and 64 Union Avenue. The evidence showed Roseway Liquors is located at 701 Lyons Avenue. Lyons Avenue runs east and west, and Roseway Liquors is located on the north side of the street. Its front door faces south. A

10

person exiting the store and turning right, heads west on Lyons Avenue, which runs under a Garden State Parkway overpass.

Once on the west side of the overpass, there are businesses located on the north side of the street. Relevant here, among those businesses is a car wash and, at the northeast corner of the intersection of Lyons Avenue and Union Avenue, there is a convenience store, King's Farm Market, which has a parking lot with entrances on Lyons Avenue and Union Avenue.

If an individual travels west on Lyons Avenue and turns north on Union Avenue, King's Farm Market is on the corner to the right at the intersection. As an individual travels north on Union Avenue, immediately behind the convenience store—again to the right on the east side of the street—is the K&J Laundromat. Farther north on Union Avenue, and also on the east side of the street is a motel, and then farther north is the apartment building at 64 Union Avenue. A short distance to the north of the apartment building is a BP gas station located at 45 Union Avenue.

The route west from Roseway Liquors on Lyons Avenue to its intersection with Union Avenue, and then north on Union Avenue to the apartment building at 64 Union Avenue is at the center of the State's proofs against defendant. The

11

State's case is bereft of physical evidence tying defendant to the murder or the murder scene at Roseway Liquors.

In great part, at trial the State relied on evidence defendant had a motive to commit the murder, arguing Patel was the victim and primary witness in the robbery case, and the January 2015 return of the results of the DNA testing tied defendant to the clothes and gun that were consistent with Patel's description of those worn and used by the perpetrator of the robbery. The State also utilized video recordings from 64 Union Avenue and various businesses on Lyons and Union Avenues between Roseway Liquors and the apartment building, claiming they showed defendant traveled to the liquor store at the precise time the murder was committed, and then returned to 64 Union Avenue after Patel was murdered.

During its case, numerous video recordings from eleven cameras along Lyons and Union Avenues, and still photos reaped from the recordings, were admitted in evidence and published to the jury without objection. As the recordings were played, they were narrated by Manago and Brian Innis, an employee in the Media Services Unit of the Essex County Prosecutor's Office.

More particularly, the surveillance recordings from the apartment building at 64 Union Avenue show a person, who both Escobar and Manago identified as defendant, moving through the basement area and other interior locations before

12

and after the murder. Recordings from the car wash, the convenience store, a liquor store located across Lyons Avenue from the convenience store, the BP gas station, a location on Union Avenue near the gas station, the laundromat, and motel show a person the State argued was defendant walking towards Roseway Liquors prior to the murder and later traveling back through the area after the murder. A surveillance video from outside of an ice cream store located to the east of Roseway Liquors was presented to demonstrate no one walked east past Roseway Liquors following the murder. The State further claimed the recordings showed the same individual changed his clothing before and after Patel's murder.

During the investigation, the police photographed defendant and seized various articles of his clothing. The police also measured defendant's height, and determined he was 5'10.5" with his shoes on. Kimberly Meline, an FBI height analysis expert, testified the suspect shown in the recordings walking past the convenience store before and after the murder was 5'10.5" tall with his shoes on.

Detective Clark testified he seized a cell phone from defendant in July 2015, five months after the murder. An examination of the cell phone revealed it contained data showing online searches using the terms "Amit Patel" and

"Amit Patel murder," and it had been used to access articles entitled "Indian-American Amit Patel Shot Dead in U.S." and "Amit Patel was Killed in Town Beset by Rash of Armed Robberies."

The State also presented Dr. Eddy Lilavois, the assistant medical examiner who performed Patel's autopsy, who testified the cause of Patel's death was a close-range gunshot wound to the head, which caused a cracking of his skull, the deposit of black powder at the entry wound and brain, and extensive blood loss. Dr. Lilavois opined the manner of death was homicide. During his testimony, the State moved for the admission of multiple photographs from Patel's autopsy that were shown to the jury.

The State also presented the testimony of a Newark police officer who recovered a gun the State claimed, based on ballistics testing, was used to commit Patel's murder. The officer testified that on October 15, 2015, eight months after the murder, he responded to the report of a robbery in progress in Newark and observed a black male wearing a black hooded sweatshirt running from the scene. The officer described the suspect as 5'5" tall, and explained the suspect dropped a 9 mm handgun, a black sweatshirt, and a white sneaker as he fled. The suspect was not apprehended but the officer recovered the handgun, sweatshirt, and sneaker.

14

Christopher Szymkowiak, a forensic scientist employed by the New Jersey State Police Office of Forensic Science, testified there were at least two different DNA profiles on the gun recovered in Newark, but the DNA profiles from the sneaker and hooded sweatshirt were too weak to be evaluated. An officer from the Newark Police Department's ballistics laboratory testified he tested the handgun and determined it was the same weapon that discharged the shell casing found at the scene of Patel's murder.

Defendant did not present any witnesses at trial. The jury found defendant guilty of all the charges arising from the robbery and murder. The jury also determined defendant committed the murder for the purpose of escaping detention, apprehension, trial, punishment, or confinement for another offense. The court therefore imposed a life sentence without parole pursuant to N.J.S.A. 2C:11-3(b)(4)(f) on defendant's conviction for knowing and purposeful murder under N.J.S.A. 2C:11-3(a). The court imposed concurrent custodial sentences on the weapons and witness tampering charges in the 2014 indictment.

Based on defendant's prior criminal record—including four prior criminal convictions, two of which were for Graves Act, N.J.S.A. 2C:43-6(c), offenses—his conviction of the first-degree robbery charge in the 2014 indictment required imposition of a mandatory extended term sentence pursuant to N.J.S.A. 2C:43-

6(c). The court imposed a forty-year extended term sentence on the robbery charge subject to the requirements of the No Early Release Act, N.J.S.A. 2C:43-7.2, and ordered defendant serve the sentence consecutive to his sentence on the murder charge. The court imposed custodial sentences on each of the remaining charges in the 2014 indictment, and ordered defendant serve those sentences concurrently to the sentence imposed on the robbery charge.

Defendant appeals from his convictions and sentence. He presents the following arguments for our consideration.

POINT I

TRIAL OF THE ROBBERY AND MURDER INDICTMENTS TOGETHER DEPRIVED [DEFENDANT] OF A FAIR TRIAL AND IRREPARABLY TAINTED THE VERDICT; THE TWO INDICTMENTS AROSE OUT OF SEPARATE EVENTS OCCURRING OVER A YEAR (FIFTEEN MONTHS) APART.

POINT II

THE PROSECUTOR ELICITED EXTENSIVE IMPROPER LAY WITNESS OPINION TESTIMONY AS TO THE CONTENT OF THE SURVEILLANCE VIDEOS AND THE IDENTITY OF THE SHOOTER.

POINT III

NUMEROUS GRUESOME AND EXPLICIT PHOTOGRAPHS, INCLUDING THOSE OF THE

16

VICTIM'S BODY IN A POOL OF BLOOD, HAD NO OTHER PURPOSE BUT TO INFLAME THE JURY.

POINT IV

THE JURY CHARGE WAS MANIFESTLY DEFICIENT ON THE KEY ISSUES OF IDENTIFICATION, AND VIDEO PLAYBACK DURING DELIBERATIONS REQUIRING REVERSAL.

A. The identification charge did not mention any of the numerous identifications of [defendant] during the narration of the surveillance videos, or the showup "partial" identification by the victim.

B. The failure to properly instruct the jury on how to consider the video played back during deliberations, as required by State v. Miller[4], had the clear capacity to produce an unjust result.

POINT V

ADMISSION OF OFFICER NEAL'S TESTIMONY ABOUT THE VICTIM'S SHOW-UP "PARTIAL" IDENTIFICATION OF [DEFENDANT] AFTER THE ROBBERY WAS REVERSIBLE ERROR.

POINT VI

THE STATE WAS IMPROPERLY ALLOWED TO PRESENT EXPERT TESTIMONY THAT A FINGERPRINT ANALYSIS COULD NOT "RULE OUT" [DEFENDANT], WITHOUT ACTUALLY MATCHING ANY FINGERPRINTS TO [DEFENDANT].

---

[4] State v. Miller, 205 N.J. 109 (2011).

<u>POINT VII</u>

THE AGGREGATE LIFE TERM OF IMPRISONMENT WITHOUT PAROLE WITH A CONSECUTIVE AGGREGATE FORTY YEARS SUBJECT TO THE NO EARLY RELEASE ACT WAS MANIFESTLY EXCESSIVE, IMPROPER, AND UNSUPPORTED BY THE REQUISITE <u>YARBOUGH</u>[5] ANALYSIS.

II.

We first consider defendant's argument his convictions should be reversed because the court erred by allowing detectives Gardner, Manago, and Innis to testify defendant is the individual depicted in various video recordings they narrated during their testimony. He contends the testimony constituted inadmissible lay opinion that was prejudicial, usurped the jury's fact-finding function, improperly bolstered the State's claim defendant committed the crimes, and had the clear capacity to produce an unjust result.

Defendant recognizes there was no objection to the challenged testimony at trial. We therefore review the admission of the testimony for plain error; that is, we must determine whether the alleged error was "of such a nature as to have been clearly capable of producing an unjust result." <u>R.</u> 2:10-2. To warrant a reversal under this standard, the "error must be sufficient to raise 'reasonable

---

[5] <u>State v. Yarbough</u>, 100 N.J. 627 (1995).

doubt . . . as to whether the error led the jury to a result it otherwise might not have reached.'" State v. Funderburg, 225 N.J. 66, 79 (2016) (quoting State v. Jenkins, 178 N.J. 347, 361 (2004)).

We review a trial court's evidentiary rulings "under the abuse of discretion standard because, from its genesis, the decision to admit or exclude evidence is one firmly entrusted to the trial court's discretion." State v. Prall, 231 N.J. 567, 580 (2018) (quoting Est. of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 383-84 (2010)). "Under [the] deferential standard, we review a trial court's evidentiary ruling only for a 'clear error in judgment.'" State v. Medina, 242 N.J. 397, 412 (2020) (quoting State v. Scott, 229 N.J. 469, 479 (2017)). A reviewing court will not substitute its "judgment for the trial court's unless," the trial court's determination "was so wide of the mark that a manifest denial of justice resulted." Ibid. (quoting State v. Brown, 170 N.J. 138, 147 (2001)).

N.J.R.E. 701 allows lay opinion testimony "if it falls within the narrow bounds of testimony that is based on the perception of the witness and . . . will assist the jury in performing its function." State v. Sanchez, 247 N.J. 450, 466 (2021) (quoting State v. Singh, 245 N.J. 1, 14 (2021)); see also State v. McLean, 205 N.J. 438, 456 (2011). To be admissible, lay opinion testimony must be supported by an "adequate foundation." Ibid. (quoting Singh, 245 N.J. at 14).

To establish an adequate foundation for the admission of lay opinion testimony, the proponent of the testimony must satisfy two requirements. See ibid. First, the opinion testimony must be "based on the witness's 'perception,' which 'rests on the acquisition of knowledge through use of one's sense of touch, taste, sight, smell or hearing.'" Singh, 245 N.J. at 14 (quoting McLean, 205 N.J. at 457); see also Sanchez, 247 N.J. at 466; State v. Watson, ___ N.J. Super. ___, ___ (App. Div. 2022) (slip op. at 79-80) (summarizing the standard for admission of lay opinion testimony under the first prong of the Singh standard). "[L]ay opinion testimony is limited to what was directly perceived by the witness and may not rest on otherwise inadmissible hearsay." Id. at 14-15 (quoting McLean, 205 N.J. at 460); see also Sanchez, 247 N.J. at 466-67.

Second, lay opinion is "limited to testimony that will assist the trier of fact either by helping to explain the witness's testimony or by shedding light on the determination of a disputed factual issue." Id. at 15 (quoting McLean, 205 N.J. at 458). "A witness may not offer lay opinion on a matter 'as to which the jury is as competent as [the witness] to form a conclusion.'"[6] Sanchez, 247 N.J. at

---

[6] In Sanchez, the Court identified factors relevant to "a trial court's determination [of] whether lay opinion testimony will assist the jury." 247 N.J. at 470-73. They include "the nature, duration, and timing of the witness's contacts with the defendant," id. at 470, "if there has been a change in the

469-70 (alteration in original) (quoting <u>McLean</u>, 205 N.J. at 459); <u>see also</u> <u>Watson</u>, ___ N.J. Super. at ___ (slip op. at 80-81) (summarizing factors to be considered under the <u>Singh</u> standard when determining whether lay opinion testimony will assist a jury).

In <u>Singh</u>, the Court applied the foregoing principles in its assessment of the admissibility of lay opinion testimony provided by a police officer identifying the defendant as the individual depicted in the events shown in a video surveillance recording. <u>Id.</u> at 17. Relying on its holdings in <u>McLean</u> and <u>State v. Lazo</u>, 209 N.J. 9 (2012), the Court found the officer's testimony identifying the defendant on the recordings constituted inadmissible lay opinion testimony because it was not based on the officer's prior personal knowledge of the defendant, the officer did not personally witness the events depicted in the recordings, it impermissibly bolstered the identification of the defendant, and it

---

defendant's appearance since the offense at issue," <u>id.</u> at 472, "whether there are additional witnesses available to identify the defendant at trial," <u>ibid.</u> (quoting <u>Lazo</u>, 209 N.J. at 23), and "the quality of the photograph or video recording at issue," <u>id.</u> at 473. In <u>Watson</u>, we detailed additional factors a court must consider in determining whether lay opinion testimony will assist a jury. ___ N.J. Super. at ___ (slip op. at 95-102). It is unnecessary that we address the application of the factors here because, as we explain, Manago's testimony constituted inadmissible lay opinion under N.J.R.E. 701 because he repeatedly identified defendant in his narration of the video recordings and those identifications require a reversal of defendant's convictions.

provided an opinion on a matter that was not beyond the understanding of the jury. Id. at 15-17.

In Singh, the police officer twice referred to the individual depicted in a video recording of a robbery as "the defendant," but otherwise referred to the individual depicted as "the suspect." Id. at 18. The Court found the officer's two references to the individual as "the defendant" constituted improper lay opinion but determined the error in admitting the testimony was harmless "given the fleeting nature of the comment and the fact that the detective referenced defendant as 'the suspect' for the majority of his testimony." Id. at 17. The Court, however, explained

> that in similar narrative situations, a reference to "defendant," which can be interpreted to imply a defendant's guilt—even when, as here, they are used fleetingly and appear to have resulted from a slip of the tongue—should be avoided in favor of neutral, purely descriptive terminology such as "the suspect" or "a person."
>
> [Id. at 18.]

Here, defendant contends Gardner, Innis, and Manago separately offered inadmissible lay opinion testimony when they identified defendant either by his name or as "defendant" as the individual depicted in various video recordings

22

they narrated as the recordings were played for the jury.[7] We consider the witnesses' testimonies in turn.

## A.

Detective Gardner testified he interrogated defendant as part of a police department internal affairs investigation of defendant's claim he was struck by a police car as he fled from the police after he was initially stopped following the 2013 robbery. The interrogation was recorded. The recording was played without objection for the jury, and the jury was provided with a transcript of the interrogation. During the interrogation, defendant admitted he was in the vicinity of the Woroco gas station when he was struck by a police car, and that after he was struck and fell, the police arrested him for the robbery.

During his testimony, Gardner narrated for the jury, without objection, a surveillance video recording from the Woroco gas station that was recorded after the robbery at Roseway Liquors. The recording was admitted in evidence without objection. During his narration of the recording, Gardner identifies an individual as "Mr. King" and "defendant," stating for example, "This is . . . Mr.

---

[7] Defendant does not separately argue the witnesses improperly identified defendant as being depicted in the still photographs taken from the video recordings, but our discussion of the principles applicable to the witnesses' identification of defendant in the video recordings applies to the identifications of defendant in the still photographs as well.

King running right there," "Mr. King is running northbound," and "you could actually see that the car didn't strike him. He actually ran into the car." Gardner also described defendant's actions and offered an opinion concerning the cause of defendant's collision with the car—faulting defendant for what occurred.

Gardner's identification of the individual in the recording by name and as "defendant," and his assignment of fault for the collision that occurred, constituted inadmissible lay opinion testimony under N.J.R.E. 701 and the principles enunciated by the Court in Singh; his testimony was not based on his personal knowledge, it bolstered the State's version of the events, and it was unnecessary to assist the jury's fact-finding, see Singh, 245 N.J. at 15-17; see also Watson, ___ N.J. Super. at ___ (slip op. at 80-81) (explaining factors to be considered when determining whether lay opinion testimony will assist a jury).

We are not, however, convinced admission of the testimony was clearly capable of producing an unjust result. R. 2:10-2. Defendant did not dispute he was depicted in the recording, defendant admitted in his recorded statement he collided with a police car after fleeing from the police, the recording and its narration related to defendant's claim the police drove the car into him, and the recording was not probative of defendant's involvement in the robbery as it pertained only to an undisputed fact defendant admitted during his statement—

24

he fled from the police after they initially stopped him. Based on those circumstances, and the otherwise substantial evidence supporting defendant's guilt on the robbery-related charges in the 2014 indictment, the error in admitting Gardner's lay opinion testimony did not constitute plain error. See, e.g., State v. Trinidad, 241 N.J. 425, 447 (2020) (explaining testimony that would not "have tipped the scales in" favor of the State is harmless error); State v. Hightower, 120 N.J. 378, 410 (1990) (finding the strength of the State's case can render officer's improper testimony as harmless).

B.

Defendant also argues the court committed plain error by allowing Detective Innis, without objection, to provide inadmissible lay opinion testimony during his narration of a four-part surveillance video that was recorded on the day of Patel's murder at the BP gas station located at 45 Union Avenue.[8] Unlike Gardner, Innis did not refer to the person depicted in the recordings, and some still photos taken from the recordings, as "defendant," "Rick King," or "Mr. King." Instead, he referred to the individual in the videos and still pictures using neutral language, such as "a person," "the person,"

---

[8] These videos are labeled S-34J2-A, S-34J2-B, S-34J-C, and S-34J2-D. Part A corresponds to the trial record references to video one, part B corresponds to video two, part C to video three, and part D to video four.

"they," "that person," "the individual," and "that individual."  We find no error in Innis's reference to the individual depicted in the recordings and photos in that manner.  See Singh, 245 N.J. at 14.

C.

Defendant also argues his convictions should be reversed because Detective Manago's narration of the numerous video recordings taken from 64 Union Avenue and the businesses along the alleged perpetrator's route to and from Roseway Liquors, and still photos taken from the recordings, was replete with identifications of defendant by name and as "defendant," and by inadmissible lay opinions concerning the actions of the individual shown.  Prior to addressing Manago's testimony, we again note the significance of the recordings that he, as lead detective in the investigation of Patel's murder, narrated for the jury.

Lacking any physical evidence tying defendant to the murder and any witnesses to the murder, the recordings constituted the life blood of the State's case.  Indeed, in its closing arguments, the State characterized the various video cameras that produced the recordings as the "witnesses" establishing defendant's guilt because, according to the State, the cameras tracked defendant from 64

Union Avenue to Roseway Liquors at the time of Patel's murder and tracked defendant's return to 64 Union Avenue following the murder.

Unlike the officer's two fleeting references to "the defendant" during the narration of recordings in Singh, throughout his more than two days of testimony Manago referred to defendant by name at least forty-six times as he narrated the recordings and testified about still photographs made from the recordings. Manago regularly referred to "Rick King" as the person seen on the videos from: 64 Union Avenue; King's Farm Market; K&J Laundromat; the motel; the BP gas station; and 40 Union Avenue. Similarly, Manago referred to the person in the still frame shots taken from the several recordings as "Rick King." Manago repeatedly used the phrase "[t]his is Rick King" to refer to the individual depicted in the video recordings.

It is unnecessary that we detail each instance Manago referred to the individual depicted in the recordings and photos as "defendant," "Rick King," or "Mr. King." It is sufficient to note there is no evidence he had any prior personal interactions with defendant, prior knowledge of defendant's appearance, or familiarity with defendant. As a result, each of his identifications of the individual depicted in the video recordings and photos as "defendant," "Mr. King," or "Rick King," constituted inadmissible lay opinion testimony

27

under the first prong of the standard for the admission of lay opinion under N.J.R.E. 701.  See Singh, 245 N.J. at 14; see also Sanchez, 247 N.J. at 469 (finding a witness satisfied the first prong of the standard for admission of a lay opinion—that the testimony was "rationally based on [her] perception"—because the witness's identification of the defendant in a video recording was based on her familiarity with the "defendant's appearance by meeting with him on more than thirty occasions" prior to the recording (alteration in original)). Nonetheless, we summarize Manago's inadmissible lay opinion testimony prior to addressing whether its improper admission constitutes plain error.

During his narration of the video recordings from 64 Union Avenue the State contends were made prior to the murder, Manago testified Rick King entered the building, walked down a hallway, entered the laundry room and removed a leather jacket, and walked out of the building.  Manago offered his opinion defendant is depicted in the recordings even though in many portions of the recordings, the individual's facial features are either not shown at all or cannot be discerned due to the quality of the recordings and the camera angles. Indeed, there are portions of the recordings where the individual's back is to the camera, but Manago nonetheless identifies the person as defendant or Rick King.

Manago similarly offered opinion testimony concerning the individual depicted in still photographs taken from the 64 Union Avenue video recordings the State claims preceded Patel's murder. For example, Manago offered testimony, such as "[t]his picture shows Rick King," "this photograph shows Rick King," and "this is a still photograph showing Rick King."

Manago provided additional opinion testimony while narrating the claimed post-murder recordings and still photos from 64 Union Avenue. He opined that the recordings showed defendant enter the building through what was referred to as the tradesman's door, go to the laundry room, exit the laundry room while wearing a leather jacket, exit the building, and then re-enter the building through its front door, enter the lobby, walk down a hallway, take a staircase to the basement, return to the laundry room, and then exit the laundry room, walk down a hall, and exit the building through the tradesman's door. Again, Manago's identification of defendant during his narration of the recordings is not based on his personal perceptions, see Sanchez, 247 N.J. at 466; Singh, 245 N.J. at 14; McLean, 205 N.J. at 447, and the State made no showing it was necessary to assist the jury in its review of the recordings, see Sanchez, 247 N.J. at 469-70.; Watson, ___ N.J. Super. at ___ (slip op. at 95-102).

Portions of the recordings and still photographs include blurred facial images and images recorded from behind the individual, and, although a juror may have been able to conclude, based on the individual's clothing, the same person is depicted in each, Manago consistently offered the opinion the individual was defendant, stating, for example, "[t]his is Rick King," "you see Rick King," "Rick King exits [64 Union Avenue]," "Rick King enters [64 Union Avenue]," "that is Rick King," and "we just watched Rick King."

In sum, Manago's narration of the recordings from 64 Union Avenue constituted inadmissible lay opinion testimony in violation of N.J.R.E. 701 and the principles explained by the Court in Singh. 245 N.J. at 14; see also Sanchez, 247 N.J. at 469. His opinions concerning the identity of the individual shown in the recordings and photographs were not based on his personal knowledge or perceptions of the individual's actions, he was not present when the individual moved about 64 Union Avenue, and his opinions were founded on the recordings and photographs the jury was equally able to view, consider, and assess in its determination of the identity of the individual or individuals depicted.

Moreover, Manago's testimony improperly bolstered the testimony of Escobar, who Manago testified identified defendant as the individual depicted in the recordings from 64 Union Avenue. Escobar properly testified at trial

A-4005-17

defendant was the individual depicted in the 64 Union Avenue recordings because he was familiar with defendant prior to the date the recordings were made. See Sanchez, 247 N.J. at 469 (finding a witness could properly identify a defendant in a recording who met with the defendant thirty times before the recording was made); Singh, 245 N.J. at 18-20 (allowing a police officer to testify that a sneaker shown on surveillance video was same as one worn by the defendant during arrest); In re Darcy, 114 N.J. Super. 454, 460 (App. Div. 1971) (permitting co-worker to testify about genuineness of the defendant's signature even though co-worker never saw the defendant sign his name); State v. Carbone, 180 N.J. Super. 95, 97-100 (Law. Div. 1981) (stating lay witness can identify bank robber from surveillance photograph under prior rule).

Escobar's credibility as a witness, including the credibility of his identification of defendant in the recordings, was an issue for the jury's determination. State v. Frisby, 174 N.J. 583, 594-95 (2002) (explaining that question of witness's credibility is for jury). "In an identification case, it is for the jury to decide whether an eyewitness credibly identified the defendant." Lazo, 209 N.J. at 24. A police officer may not "improperly bolster or vouch for an eyewitness'[s] credibility and thus invade the jury's province." Ibid. Here, Manago's inadmissible lay opinion testimony concerning the identity of the

individual depicted in the 64 Union Avenue recordings improperly "conveyed his approval of [Escobar's] identification by relaying that he, a law enforcement officer, thought defendant looked like the culprit as well." Sanchez, 247 N.J. at 467 (quoting Lazo, 209 N.J. at 24).

The State argues that even if Manago's lay opinion testimony during his narration of the recordings from 64 Union Avenue is inadmissible, its presentation to the jury did not constitute plain error. The State notes defendant did not dispute he is depicted in the recordings and defendant's counsel conceded in his opening statement the jury would see defendant in recordings from 64 Union Avenue. We might agree with the State's argument if Manago's identifications of defendant in the recordings were limited to the recordings made at 64 Union Avenue and were otherwise untethered to other inadmissible lay opinion but, as we have explained, Manago's inadmissible identifications of defendant permeated his testimony and the State's proofs at trial. In addition, counsel's statement in his opening did not relieve the State of presenting admissible evidence establishing its case beyond a reasonable doubt or allow the State to rely on inadmissible evidence to bolster, with the affirmative testimony of an experienced law enforcement officer, Escobar's identification of defendant

32

as the individual depicted in recordings that do not consistently offer a clear view of the individual's face.

In any event, although on appeal defendant focuses on those portions of Manago's lay opinion testimony concerning the 64 Union Avenue recordings, we cannot properly assess the impact of that testimony concerning the 64 Union Avenue recordings in isolation where, as here, it constituted only one of many essential threads the State sought to weave together to establish defendant's guilt. We therefore consider other instances of inadmissible lay opinion offered by Manago's testimony to determine if the testimony, including his inadmissible testimony concerning the 64 Union Avenue recordings, was clearly capable of producing an unjust result. R. 2:10-2.

Manago offered inadmissible lay opinion testimony identifying defendant in recordings taken from the cameras at King's Farm Market. During his narration of the surveillance videos from the parking lot of King's Farm Market, Manago repeatedly states the individual in the videos with timestamp 2:37 p.m. (camera seven) is defendant even though neither the individual's clothing nor facial features are discernable, and he testified the individual shown at timestamp 2:38 p.m. (camera eight) is defendant even though the individual's facial features are not discernable. Manago further testified "Rick King" can be

seen coming from Union Avenue, entering King's Farm Market, and then exiting the market at recordings timestamped at 3:53 p.m. and 3:54 p.m. Manago then stated "Rick King" can be seen walking from the market through the parking lot to Lyons Avenue and looking down the street toward Roseway Liquors. Manago also used still photos from the recordings, again identifying the individual depicted as Rick King, to provide the same narration of his version of what occurred.

The clear implication of the testimony is that the person Manago identified as Rick King in the recordings and photos returned to King's Farm Market shortly after the murder, walked to Lyons Avenue, and looked in the direction of the Roseway Liquors because he committed the murder and was interested in whatever police or other activity there was related to the murder at the store. Indeed, the State relied on Manago's narration of those portions of the recordings—and Manago's repeated identification of defendant—to make that point to the jury during its closing argument.

Manago similarly testified defendant is an individual depicted in recordings from K&J Laundromat located at 144 Union Avenue, immediately north of King's Farm Market. In recordings taken prior to the murder, and still photos taken from them, Manago repeatedly refers to an individual shown as

Rick King and describes the individual's movement. In one video (4-42-10 S-47-B1-D) a person is not seen "running" past the laundromat as Manago describes during his testimony. Rather, the person walks past the laundromat and then jogs for the last few steps before he or she leaves the frame of the recording. Manago's inadmissible lay opinion identifying defendant as the individual shown in the recordings supported the State's theory defendant shot Patel and fled from Roseway Liquors, and then quickly down Union Avenue, to return to the apartment building at 64 Union Avenue.

Manago also testified an individual seen in the videos taken from the motel located at 100 Union Avenue was defendant. In his narration of a video filmed prior to the shooting, Manago stated defendant is walking on Union Avenue past the driveway entrance to the motel, then a few minutes later is seen in front of the motel walking around a car. Manago claimed that in the same recording defendant is seen walking out from behind a wall a few minutes after he walked around the car. Further, in a video taken after the shooting, Manago testified that defendant is seen running down Union Avenue and, a few minutes later, defendant can be seen over a fence and near a wall. Manago similarly testified defendant is the individual in still photos taken from the motel's video recordings.

A-4005-17

During his narration of one portion of the motel's recordings, Manago describes the movement of an individual down Union Avenue. The recording does not show the person's face, and his or her clothing cannot be discerned. Nonetheless, Manago testified, "this is part of the homicide. This [is] Rick King. Rick King walking past the driveway entrance to the" motel.

Again, Manago's identification of the individual in the recordings and photographs, and his declaration some movements by an individual he stated as fact was defendant were "part of the homicide," constitute inadmissible lay opinion under N.J.R.E. 701. See Singh, 245 N.J. at 14-17. His identification of defendant in the recordings and photos from the motel are particularly egregious because it is impossible to discern the facial features or even the clothing of the individual depicted. Yet, despite Manago's lack of any prior personal knowledge of defendant, and the manifest lack of clarity of the recordings and photos, he consistently identifies the individual as Rick King or defendant as if it were fact.

Manago further testified defendant is the individual seen in recordings from the BP gas station located at 45 Union Avenue. For example, Manago testified that in one recording defendant is seen walking into and out of the apartment building at 64 Union Avenue, and, in another recording, defendant

36

exits the building and walks down Union Avenue carrying a dark garbage bag in his left hand, crossing through the BP gas station parking lot, and moving out of the recording's frame. During his narration of a recording from 40 Union Avenue, Manago testified defendant can be seen near the BP gas station when the recording is viewed in conjunction with recordings from 64 Union Avenue and the BP gas station. And, the State relied on Manago's narration of those recordings, claiming in summation they showed defendant getting rid of the clothes he wore during the commission of the murder.

During portions of Manago's testimony, he properly referred to individuals that were seen on recordings from the car wash and the liquor store across Lyons Avenue from King's Farm Market in neutral terms, such as "he," "the individual," "the person," and "the suspect." See Singh, 245 N.J. at 17-18. We note the individuals he identified in the recordings as such appear as dark silhouettes, but Manago describes their movements, offers a lay opinion they are the same person, and, in other testimony, links the individual he identifies from the car wash recordings with the person seen in the King's Farm Market recordings, who he identifies as defendant. Thus, even Manago's neutral references to individuals seen on the various recordings from the car wash and liquor store across from King's Farm Market are tethered to inadmissible lay

37

opinion testimony the individuals are the same person, and the neutral references are linked by other inadmissible lay opinion testimony to defendant.

The State's proofs defendant murdered Patel rest on the alleged movement of an individual depicted in the recordings from 64 Union Avenue to Lyons Avenue to Roseway Liquors immediately prior to the murder, and the alleged movement of an individual depicted in the recordings down Lyons Avenue to Union Avenue and to 64 Union Avenue immediately following the murder. According to the State, defendant's movement along those routes is established by the various recordings Manago narrated in detail during his lengthy testimony. Indeed, as the State's case was presented at trial, Manago's inadmissible lay testimony is the only testimonial evidence defendant is that individual, such that the State was able to convincingly argue the recordings were of the same person—defendant—who moved to and from the scene of the murder immediately before and after its occurrence. There was nothing fleeting about Manago's identifications of defendant on the various recordings. See Singh, 245 N.J. at 17-18. Manago's inadmissible lay opinion testimony was so pervasive and important to the State's proofs at trial that we have no difficulty in concluding its admission was clearly capable of producing an unjust result.

<u>R.</u> 2:10-2.  For those reasons, we reverse defendant's convictions and remand for a new trial.[9]

### III.

Defendant claims the court erred by granting the State's motion for joinder of the separate charges related to the 2013 robbery and 2017 murder.  He contends the court abused its discretion by granting joinder because the robbery and murder are factually separate and distinct events that occurred fifteen

---

[9]  Although in <u>Watson</u> we explained a police officer may under certain circumstances describe events shown in a video recording for a jury, ___ N.J. at ___ (slip op. at 83-102), nothing in the opinion departs from the principles in <u>Singh</u> and <u>Sanchez</u> prohibiting a police officer who has no prior knowledge of a defendant or personal knowledge of what occurred on a recording from identifying a person shown in a recording as the defendant, <u>see id.</u> at 74 (explaining the majority in <u>Singh</u> "determined that it was error for the detective to refer to the suspect in the video as 'the defendant'").  As we have explained, we reverse because Manago's testimony consistently violated those principles. We note Manago's testimony included other narrations of what is depicted in the recordings—including, for example, his description of what he described as a bulge in defendant's clothing and his declaration defendant changed his clothing. Similarly, during his narration of a recording, Innis offered an opinion the individual's clothing looked differently than it had in a prior segment of the recording.  In both instances, the witnesses did not have personal knowledge concerning what they claimed the recordings depicted.  <u>See</u> <u>McLean</u>, 205 N.J. at 456-57 (explaining lay opinion testimony must be based on information the witness acquired "through use of one's sense of touch, taste, sight, smell or hearing"). On remand, however, the court shall address the admissibility of such testimony, and any other anticipated testimony narrating video recordings, in accordance with the principles and procedure established in <u>Watson</u>.  <u>See</u> generally ___ N.J. at ___ (slip op. at 83-107).

A-4005-17

months apart, "the only thing they have in common are the victim and the location," and defendant suffered undue prejudice from the presentation of evidence concerning each incident with the trial on the charges concerning the other incident.

Rule 3:15 authorizes a court to "order [two] or more indictments . . . tried together if the offenses . . . could have been joined in a single indictment." See also R. 3:7-6 (permitting joinder "if the offenses charged are of the same or similar character or are based on the same act or transaction or on [two] or more acts or transactions connected together or constituting parts of a common scheme or plan"). Joinder is favored to promote judicial economy and efficiency, but those "interests do not override a defendant's right to a fair trial." State v. Sterling, 215 N.J. 65, 72 (2013).

In our review of a trial court's decision permitting joinder of separate offenses, we "assess whether prejudice is present, and [the court's] judgment is reviewed for an abuse of discretion." Sterling, 215 N.J. at 73; accord State v. Chenique-Puey, 145 N.J. 334, 341 (1996). "The test for assessing prejudice is 'whether, assuming the charges were tried separately, evidence of the offenses sought to be severed would be admissible under [N.J.R.E. 404(b)] in the trial of

the remaining charges.'"  Ibid. (alteration in original) (quoting Chenique-Puey, 145 N.J. at 341).

Because of the dangers that admission of other crimes evidence presents, "evidence proffered under Rule 404(b) 'must pass [a] rigorous test.'"  State v. Garrison, 228 N.J. 182, 194 (2017) (alteration in original) (quoting State v. Kemp, 195 N.J. 136, 159 (2008)).  In State v. Cofield, 127 N.J. 328, 338 (1992), our Supreme Court established a four-part test for determining the admissibility of other-crime evidence:

> 1.  The evidence of the other crime must be admissible as relevant to a material issue;
>
> 2.  It must be similar in kind and reasonably close in time to the offense charged;
>
> 3.  The evidence of the other crime must be clear and convincing; and
>
> 4.  The probative value of the evidence must not be outweighed by its apparent prejudice.
>
> [Garrison, 228 N.J. at 194 (quoting Cofield, 127 N.J. at 338).]

Here, defendant does not challenge the motion court's determination that evidence concerning the robbery is relevant to material issues—defendant's motive, intent, and identity—pertinent to establishing defendant's alleged commission of the murder.  See State v. Rose, 206 N.J. 141, 165 (2011)

41

(explaining "[a] wide range of motive evidence is generally permitted, and even where prejudicial, its admission has been allowed in recognition that it may have 'extremely high probative value'" (quoting State v. Long, 173 N.J. 138, 164-65 (2002))); id. at 145-46 (finding the defendant's previous incarceration and indictment for the attempted murder of a victim admissible in defendant's trial for arranging the murder of the victim because the evidence was relevant to the defendant's motive, intent, and plan to commit the murder).

Defendant also does not challenge the court's determination that evidence showing defendant murdered Patel is relevant to his alleged commission of the robbery because it establishes his consciousness of guilt for the commission of the robbery, and, in doing so, tends to establish defendant's identity as the perpetrator of the robbery. See, e.g., State v. Yough, 208 N.J. 385, 402 n.9 (2011) (noting evidence a defendant threatened or intimidated the victim of a robbery following a robbery "would be admissible to demonstrate consciousness of guilt under N.J.R.E. 404(b)"); State v. Williams, 190 N.J. 114, 125 (2007) (finding a jury may consider a defendant's attempts to cover up a crime as evidence of consciousness of guilt). Thus, the court did not abuse its discretion in finding the first Cofield factor favored joinder of the offenses in the 2014 and 2017 indictments.

Defendant also does not claim the evidence does not clearly and convincingly establish defendant committed the separate offenses. And our review of the evidence—without consideration of the evidence we have determined was inadmissible at trial—confirms there is clear and convincing evidence defendant committed the separate offenses such that the third Cofield factor supports the court's joinder of the charges in the separate indictments for trial.

Defendant's challenge to the court's joinder order is focused solely on the second and fourth Cofield factors. Defendant first argues there is insufficient evidence supporting admission of evidence concerning the robbery and murder at the same trial under the second Cofield factor because the crimes are dissimilar and do not have a close temporal proximity. However, as the Court explained in Rose, "[t]he second prong of the Cofield test, addressing the similarity and temporality of the evidence, is not found in Rule 404(b), and is not universally required." 206 N.J. at 163. Application of the second prong of the Cofield test "is limited to cases that replicate the circumstances in Cofield," Williams, 190 N.J. at 131, and defendant makes no showing circumstances

similar to those extant in <u>Cofield</u> are present here.[10] Thus, we reject defendant's argument that any purported lack of similarity or close temporal proximity between the robbery and murder under <u>Cofield</u>'s second factor required the denial of the State's joinder motion. <u>See</u> <u>Rose</u>, 206 N.J. at 160 (explaining "[t]emporality and similarity of conduct is not always applicable, and thus not required in all cases").

We also are not persuaded the court erred by rejecting defendant's claim that under <u>Cofield</u>'s fourth factor, the probative value of evidence concerning the crimes charged in the separate indictments is outweighed by its apparent prejudice. An assessment of <u>Cofield</u>'s fourth factor "necessarily implicates an examination into whether less inflammatory sources of evidence that are equally probative are available." <u>Rose</u>, 206 N.J. at 164. Here, the record is devoid of less inflammatory sources of evidence that equally establish defendant's consciousness of guilt for the commission of a robbery for which the victim is no longer available to testify and defendant, in his statements to the police, denied committing. Similarly, there is no less inflammatory evidence of

---

[10] In <u>Williams</u>, the court explained the "similar in kind and reasonably close in time" factor in <u>Cofield</u>'s second prong was applied in <u>Cofield</u> where "[t]he State sought to admit . . . similar and close-in-time other-crimes evidence as relevant to prove the defendant's possession of drugs in the charged offense, an element that was hotly contested." 190 N.J. at 131.

defendant's motive, intent, and plan to allegedly commit what may be properly characterized as a cold-blooded execution other than defendant's alleged commission of the robbery and desire to rid himself of the sole witness to the robbery, Patel.

To be sure, evidence concerning the separate offenses was prejudicial when presented in a joint trial, "[b]ut, it was prejudicial in the way all highly probative evidence is prejudicial:  because it tends to prove a material issue in dispute." Rose, 206 N.J. at 164.  The relevant inquiry "is whether the evidence was unfairly prejudicial, that is whether it created a significant likelihood that the jury would convict defendant on the basis . . . he was a bad person, and not on the basis of the actual evidence adduced against him." Ibid.  In our view, the evidence permitted a proper response to that inquiry in the negative and, for that reason, we reject defendant's claim the court erred by joining the charges in the 2014 and 2017 indictments for trial.

IV.

During its case, the State introduced six of sixty-nine crime scene photographs, six of twenty-one autopsy photographs,[11] and five photographs of

_____

[11] Defendant argues the court erred by admitting seven autopsy photos, but he includes only six autopsy photos in his appendix on appeal.  We are therefore

defendant obtained from the cell phone recovered following the robbery that defendant contends the court erroneously admitted in evidence. He claims the photographs are inflammatory, and whatever relevance they may have is outweighed by their undue prejudice.

A court's decision to admit photographs is reviewed for an abuse-of-discretion. State v. Johnson, 120 N.J. 263, 297 (1990). A court abuses its discretion when the "tenuous relevance" of the admitted evidence "was overwhelmed by [the] inherently prejudicial nature [of the evidence]." State v. Lockett, 249 N.J. Super. 428, 433 (App. Div. 1991). In other words, if the trial court's finding was "so wide [of] the mark that a manifest denial of justice resulted," then it abused its discretion. State v. Lykes, 192 N.J. 519, 534 (2007) (alteration in original) (quoting Verdicchio v. Ricca, 179 N.J. 1, 34 (2004)).

Defendant objected to the admission of six crime scene photographs, claiming the probative value of the images is outweighed by their undue prejudice because they depicted excessive amounts of blood. See N.J.R.E. 403;

---

unable to consider or assess the propriety of the court's purported admission of a seventh autopsy photo. See R. 2:6-1(a)(1)(i) (requiring the appellant to provide on appeal such parts of the record "as are essential to the proper consideration of the issues"); see also Cmty. Hosp. Grp., Inc. v. Blume Goldfaden Berkowitz Donnelly Fried & Forte, PC, 381 N.J. Super. 119, 127 (App. Div. 2005) (explaining a reviewing court will not review an issue where the pertinent portion of the trial record are not provided on appeal).

see also State v. Carter, 91 N.J. 86, 106 (1982) (explaining a party seeking to exclude evidence bears the burden of establishing the probative value is substantially outweighed by the risk of undue prejudice). The challenged photographs showed: Patel lying in a pool of blood; the left side of Patel's head and the entry wound; a close-up view of the entry wound; blood near Patel's right ear and the exit wound; Patel's scalp and the entry wound; and Patel's wedding ring on his right hand.[12]

We are not persuaded admission of the photographs constituted an abuse of discretion. The court admitted the photograph showing Patel lying in a pool of blood because it revealed the location and position of Patel's body after the murder, the type of gunshot wound inflicted, and that the shooter was in close proximity to Patel. The court found the extent of the blood at the scene supported the State's claim the shooter was likely to have blood on his or her clothing such that they would be motivated to dispose of their clothing following the murder. "[T]he presence of blood and gruesome details are not ipso facto grounds for exclusion," of crime scene photos, State v. Morton, 155 N.J. 383, 456 (1998) (quoting State v. DiFrisco, 137 N.J. 434, 500 (1994)), and, for the

---

[12] The photos were admitted in evidence as exhibits S-32H-36, S-32H-55, S-32H-57, S-32H-59, S-32H-61, and S-32H-62, respectively.

reasons noted by the trial court, "[t]he relevance of [the] photograph[] was not outweighed by [its] potential to prejudice to the jury," ibid.

Another crime scene photograph admitted in evidence showed Patel's bloody hand with a wedding ring on one of his fingers. The photograph is not particularly gruesome, and it is probative of the State's theory the murder was a knowing and purposeful execution unaccompanied by any intent to rob the victim. Again, we discern no basis to conclude the court abused its discretion by rejecting defendant's claim the probative value of the photograph was substantially outweighed by any undue prejudice.

Two of the remaining crime scene photos show closeups of the entry wounds to Patel's head and two others show the exit wounds. Three of the photographs are closeups of Patel's head, and the remaining photograph includes Patel's bloodied face. Although it was perhaps unnecessary to admit all the photographs to show the wounds, the photographs were probative of the manner in which Patel was shot and supported the coroner's determination of the manner of death—homicide. We have recognized photographs of murder victims may be "unpleasant" but that does not render them inadmissible where their probative value is not substantially outweighed by some undue prejudice. State v. Sanchez, 224 N.J. Super. 231, 250 (App. Div. 1988).

We similarly find no abuse of discretion in the court's admission of five of the seven photographs found on the cell phone recovered from the garbage can following the robbery.[13] Defendant contends the photographs are unduly prejudicial because they show him either naked or without items of clothing, with his genitalia redacted. There is nothing about the redacted photographs that are unduly prejudicial, and, as the court correctly determined, the photographs are probative of defendant's ownership of the phone that was recovered from the pocket of the sweatshirt that was found with the gun following the 2013 robbery. Defendant offers no basis to conclude the purported undue prejudice from the admission of the photographs substantially outweighed their significant probative value.

Defendant also challenges the court's admission of six autopsy photographs, which show: the lower half of Patel's body on the autopsy table; the right side of Patel's head and the exit wound; a close-up of the right side of Patel's head and the exit wound; the left side of Patel's skull and the entry wound;

---

[13] The photos were admitted in evidence as exhibits S-18G1, S-18G2, S-18G3, S-18G5, and S-18G6.

A-4005-17

a close-up of the left side of Patel's skull and entry wound; and Patel's skull showing burnt skin around the entry wound and stippling.[14]

The court found the photograph of the lower half of Patel's body admissible because it assisted the jury in understanding the medical examiner's testimony and showed the pockets in Patel's pants were undisturbed, which supported the State's claim the perpetrator had no interest in robbing Patel.

The court further found the four photographs of Patel's head were not gruesome, did not include excessive blood, and supported the medical examiner's testimony concerning the cause of Patel's death. The court also found the photograph of Patel's skull showing stippling and burnt skin was probative of the State's theory he was the target of a gunshot administered at very close range and the photograph otherwise supported the medical examiner's testimony and assisted the jury in understanding the testimony.

Again, we find no abuse of the court's discretion in admitting the photographs based on the court's finding their probative value was not substantially outweighed by any undue prejudice. In his brief on appeal, defendant expressly argues only that the photograph showing Patel's skull is

---

[14] The photos were admitted in evidence as exhibits S-60A-1, S-60A-15, S-60A-16, S-60A-17, S-60A-18, and S-60A-21, respectively.

unduly prejudicial. But the trial court did not abuse its discretion by concluding the photograph was probative of the fact that the murder—which the State argues constituted an execution to prevent Patel from testifying in the robbery case—was knowingly and purposely committed at very close range in a manner consistent with the State's theory and the medical examiner's testimony concerning the cause and manner of Patel's death.

In sum, we are not persuaded the court abused its discretion in the admission of any of the photographs. That does not mean they shall be automatically admitted at the trial on remand. At any retrial, the judge should carefully review each of the photographs submitted by the State in the context of the evidence presented at that time and make specific findings under N.J.R.E. 401 and N.J.R.E. 403 to determine which photographs may be properly admitted.

V.

For the first time on appeal, defendant claims the court provided inadequate jury instructions on the issues of identification and prior to the playback of video recordings requested during the jury's deliberations. Defendant claims the purported errors deprived him of a fair trial.

"An essential ingredient of a fair trial is that a jury receive adequate and understandable instructions.  Correct jury instructions are 'at the heart of the proper execution of the jury function in a criminal trial.'"  State v. Afanador, 151 N.J. 41, 54 (1997) (citation omitted) (quoting State v. Alexander, 136 N.J. 563, 571 (1994)).  A trial court must explain the law as it relates to the facts and issues of the case.  State v. Baum, 224 N.J. 147, 159 (2016).  Erroneous jury instructions on "material" aspects are assumed to "possess the capacity to unfairly prejudice the defendant."  Ibid.

A reviewing court must evaluate the jury charge in its entirety to determine its overall effect.  State v. Savage, 172 N.J. 374, 387 (2002); see also State v. Wilbely, 63 N.J. 420, 422 (1973) (stating that jury charge must be accurate when evaluated as whole).  Where, as here, a defendant fails to object to the jury charge, there is a presumption the charge was not erroneous, and counsel did not determine that the charge was prejudicial.  State v. Singleton, 211 N.J. 157, 182 (2012).  We therefore consider whether any errors constituted "[l]egal impropriet[ies] . . . prejudicially affecting the substantial rights of the defendant sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result."  State v. Jordan, 147 N.J. 409, 422 (1996) (quoting State

v. Hock, 54 N.J. 526, 538 (1969)). In criminal cases, an error in the jury instructions is only excusable if it is harmless beyond a reasonable doubt. State v. Vick, 117 N.J. 288, 292 (1989).

The trial court charged the jury substantially in accord with the Model Jury Charge on in-court and out-of-court identifications. See Model Jury Charges (Criminal), "Identification: In-Court and Out-of-Court Identifications" (rev. July 19, 2012).[15] During the charge, the court noted that Escobar identified defendant as the person in the surveillance videos taken from 64 Union Avenue, and the court explained the factors pertinent to the jury's consideration of Escobar's identification.

Defendant claims the court erred because the court's instruction did not refer to the identifications of defendant made by detectives Gardner and Manago during their respective narrations of the various video recordings. The court did not specifically address the identifications of defendant on the surveillance videos by Manago or Gardner. As we have explained, the identifications of

---

[15] The instruction was modified on May 18, 2020, subsequent to defendant's trial. See Model Jury Charges (Criminal), "Identification: In-Court and Out-of-Court Identifications" (rev. May 18, 2020). This model jury charge was revised to add instructions for cases where the police did not electronically record the out-of-court identification procedure and when a database of digital photographs was utilized. Ibid.

defendant made by the detectives during their narrations of the recordings and photographs constituted inadmissible lay opinion testimony, and for that reason defendant's convictions are reversed and the matter is remanded for new trial. As a result, it is unnecessary to address defendant's argument concerning the jury instructions because the same issue will not arise on remand.

Moreover, in our assessment of the validity of the jury instructions provided by the trial court, we are loathe to suggest the court should have provided an instruction concerning the identifications of defendant made by the detectives where the identifications should not have been admitted in evidence in the first instance. We observe only that, as the Model Jury instruction makes clear, a proper charge to the jury should reference any witness who the evidence shows made an out-of-court identification, as well as any witness who makes an in-court identification. See Model Jury Charges (Criminal), "Identification: In-Court and Out-of-Court Identifications" (rev. May 18, 2020).

We also note that immediately following its provision of the Model Jury charge on identification, the court provided a specific instruction, at defendant's request, concerning the jury's consideration of the identifications of defendant provided during the narrations of the video recordings. The court stated:

> There is for your consideration in this case several surveillance videos. While some of—while some

> witnesses have testified concerning their belief as to what is depicted in the video, it is your function to determine what is depict [sic] in the video, and whether the video or any portion of it is credible. You may consider all the circumstances surrounding the video in making that determination.

Although the instruction states it is the jury's function to determine "what" occurred in the recordings, we find it wholly inadequate to have remedied, or rendered harmless, the erroneous admission of the pervasive and inadmissible lay opinion identifications of defendant by the detectives. In the first instance, the instruction is too narrow; it informs the jury its function is to determine "what" occurred on the recordings and not who is depicted on them. More importantly, it does not inform the jury Manago's numerous identifications of defendant and statements concerning defendant's actions on the recordings—including the detective's declaration one recording shows defendant involved in the homicide—constitute inadmissible evidence that cannot properly be considered in the jury's performance of its function. Thus, although the instruction informs the jury its function is to determine what the recordings showed, the instruction did not prohibit the jury from fulfilling that function based on consideration of inadmissible identifications offered as fact during the testimony of the detectives.

A-4005-17

Defendant argues for the first time on appeal the court erred by failing to provide instructions to the jury concerning the proper consideration of the requested playback of the video recordings during deliberations. Because the issue was not raised before the trial court and does not "go to the jurisdiction of the trial court or [a] matter[] of great public interest[,]" see State v. Robinson, 200 N.J. 1, 20 (2009), and because we reverse defendant's convictions on other grounds, we opt not to address the merits of the argument.

We note playbacks of recordings requested by a jury during deliberations should be accompanied by appropriate instructions in accordance with the guidelines established by the Court in Miller, 205 N.J. at 122-24. See State v. A.R., 213 N.J. 542, 564 (2013) (explaining the Court "expects full and careful consideration and application of the . . . Miller guidance in all situations in which playbacks of video-recorded exhibits or trial proceedings are conducted"). We also note, however, that defendant's brief on appeal does not demonstrate the trial court's failure to comply with the Miller guidelines was clearly capable of producing an unjust result. R. 2:10-2.

## VI.

Defendant next argues the court erred by allowing Officer Neal to testify about Patel's partial identification of defendant—by stating defendant's height,

weight, jeans, and boots matched those worn by the perpetrator of the robbery, and the cash defendant possessed matched the denominations of the currency taken during the robbery—during the showup identification procedure at the Woroco gas station following the robbery. Defendant claims the showup procedure was inherently suggestive, and the procedure violated the principles established in State v. Henderson, 208 N.J. 208, 259-61 (2011).[16]

We review a trial court's evidentiary ruling for an abuse of discretion. State v. Garcia, 245 N.J. 412, 430 (2021) (citing State v. Nantambu, 221 N.J. 390, 402 (2015)). "We will not substitute our judgment unless the evidentiary

---

[16] Defendant vaguely suggests the court erred by failing to provide a final jury charge concerning Patel's statements during the showup identification procedure at the Woroco gas station. The claim is undermined by the record because defendant argued at trial a showup charge was unnecessary because Patel did not identify defendant during the showup; Patel said he could not identify defendant because the perpetrator's face was covered, and Patel stated only that defendant's blue jeans, boots, height, and weight were the same as the perpetrator. The court accepted defendant's position Patel did not identify defendant as the perpetrator, and, for that reason, did not provide an instruction concerning showup procedures. Under those circumstances, any error in not providing the charge was invited and, therefore, does not provide grounds for reversal. See A.R., 213 N.J. at 561 (explaining the invited error doctrine). In any event, based on the evidence presented at trial on remand, the parties are permitted to request or oppose such a charge, and the court shall determine the applicability of the charge based on the evidence presented. See generally Model Jury Charges (Criminal), "Identification: Out-of-Court Identifications Only" (rev. July 19, 2012) (including a jury instruction concerning consideration of showup identification evidence).

ruling is 'so wide of the mark' that it constitutes 'a clear error in judgment.'" Ibid. (quoting Medina, 242 N.J. at 412). A trial court abuses its discretion "when a decision is 'made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" State v. R.Y., 242 N.J. 48, 65 (2020) (quoting Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002)).

The court's ruling defendant challenges was addressed to the admissibility of Neal's testimony concerning Patel's statements during the showup procedure under the forfeiture-by-wrongdoing exception to the hearsay rule, N.J.R.E. 802, embodied in N.J.R.E. 804(b)(9). See generally State v. Rinker, 446 N.J. Super. 347, 359-365 (App. Div. 2016) (explaining principles applicable to admission of statements under the "forfeiture-by-wrongdoing" exception to the hearsay rule, N.J.R.E. 802, that is embodied in N.J.R.E. 804(b)(9)). On appeal, defendant does not challenge the court's determination of the admissibility of Patel's various statements under N.J.R.E. 804(b)(9). Instead, defendant argues for the first time Patel's statements to Neal during the showup procedure at the Woroco gas station are inadmissible for a wholly separate reason—they are not admissible under the principles governing the admission of out-of-court identifications in Henderson.

We generally do not consider issues raised for the first time on appeal, including issues of constitutional significance, unless they go to the court's jurisdiction or concern matters of significant public interest. Robinson, 200 N.J. at 20. We therefore do not address defendant's claim other than to note defendant's decision not to raise it deprived the trial court of an opportunity to develop a fulsome record and therefore results in a record on appeal that does not permit a proper consideration of the claim. See State v. Pressley, 232 N.J. 587, 592 (2018) ("encourag[ing]" the parties disputing the admissibility of showup evidence "to make a full record before the trial court, which can be tested at a hearing by both sides and then assessed on appeal").

In any event, because we reverse defendant's conviction, defendant shall be permitted to challenge the admissibility of the evidence concerning the showup procedure before the trial court on remand. We offer no opinion on the merits of defendant's argument or the State's opposition. The issue shall be addressed and decided by the court based on the record presented on remand.

VII.

Defendant also claims the court erred by permitting, over his objection, the State's fingerprint expert Sergeant Tom Sheehan to testify defendant could not be ruled out as a contributor to the fingerprints found on the gun recovered

on October 15, 2015, in Newark. Defendant argues the testimony shifted the burden of proof to him and was otherwise inadmissible as a net opinion.

We review a court's decision admitting expert testimony for an abuse of discretion. Townsend v. Pierre, 221 N.J. 36, 52 (2015). Defendant does not argue Sheehan's testimony did not satisfy the requirements of the admission of expert testimony under N.J.R.E. 702. See generally id. at 53 (explaining the "three core requirements for" admission of expert testimony). Instead, he argues Sheehan's testimony was inadmissible as a net opinion.

The net opinion rule "forbids the admission into evidence of an expert's conclusions that are not supported by factual evidence or other data." Id. at 53-54 (quoting Polzo v. Cnty. of Essex, 196 N.J. 569, 583 (2008)). For an expert opinion to be admissible, the expert must "'give the why and wherefore' that supports the opinion, 'rather than a mere conclusion.'" Id. at 54 (quoting Borough of Saddle River v. 66 E. Allendale, LLC, 216 N.J. 115, 144 (2013)). The "rule simply stands for the proposition that an expert opinion must have a rational basis." Crispino v. Twp. of Sparta, 243 N.J. 234, 257 (2020).

We discern no basis to conclude Sheehan's testimony concerning the fingerprints found on the gun constituted an inadmissible net opinion, and defendant offers none. Sheehan explained his analysis of the fingerprints found

on the gun, testified they were of insufficient clarity for purposes of identifying them as defendant's or someone else's, and opined the fingerprints therefore could not be either determined to be defendant's or ruled out as being defendant's. Sheehan's testimony was grounded in the facts gleaned from his examination of the fingerprints on the gun, and his comparison of those fingerprints to defendant's, and he fully explained the why and wherefore for his opinion. Contrary to defendant's contention, Sheehan's testimony did not constitute an inadmissible net opinion.

We find no merit to defendant's conclusory assertion Sheehan's testimony improperly shifted the burden of proof. There is nothing in his testimony or the way it was presented that shifted the burden of proof during the trial, and the court's instructions at the commencement of the case and in its final charge made clear the burden of proving each and every element of the offenses charged beyond a reasonable doubt rested solely upon the State. We may "presume that the jury faithfully followed [the] instruction[s]" it received. Miller, 205 N.J. at 126; see also State v. Marshall, 173 N.J. 343, 355 (2002).

## VIII.

Because we reverse defendant's convictions and remand for a new trial, it is unnecessary to address in detail his contention the court erred in imposing

sentence. We note only that in the event defendant is convicted after trial of the offenses in the indictments, the court must address the issue of merger as to offenses for unlawful possession of a weapon and possession of a weapon for an unlawful purpose, see State v. Diaz, 144 N.J. 628, 639 (1996), and must consider and make appropriate findings of the factors pertinent to the imposition of any consecutive sentences, see State v. Torres, 246 N.J. 246, 268-70 (2021); Yarbough, 100 N.J. at 643-45. Of course, in any sentence imposed in the event of a conviction, the court shall consider and weigh the aggravating and mitigating factors as required under N.J.S.A. 2C:44-1 and apply all principles applicable to the imposition of sentence under our Criminal Code. See generally State v. Fuentes, 217 N.J. 57, 70 (2014).

Any arguments made on defendant's behalf we have not expressly addressed are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4005-17